(No. 56751.—

DONALD ESTEP *et al.*, Appellees, v. THE DEPART-
MENT OF PUBLIC AID *et al.*, Appellants.

*Opinion filed September 30, 1982.—Rehearing
denied November 24, 1982.*

SIMON and CLARK, JJ., dissenting.

Jeremiah Marsh, Special Assistant Attorney General,
of Springfield (John L. Rogers III, John N. Gavin, and
David O. Toolan, of Hopkins & Sutter, of Chicago, of coun-
sel), for appellants.

Thomas Johnson, Robert E. Lehrer, Dveera Segal,
Marianne Smigelskis, Mark C. Weber, and Robert Burns,
all of Chicago, for appellees.

James P. Chapman, of Chicago, for *amicus curiae* the
People Organized for Welfare and Employment Rights.

JUSTICE GOLDENHERSH delivered the opinion of the court:

This action was filed in the circuit court of Cook County by plaintiffs, Donald Estep, Betty Hodges and Annie Stewart, who describe themselves as persons receiving adult General Assistance benefits from the Illinois Department of Public Aid. In their complaint against defendants, the Department of Public Aid and its Director, Jeffrey C. Miller, plaintiffs allege that they sue "individually and on behalf of a class of similarly situated persons." They sought a declaratory judgment that proposed reductions of adult General Assistance benefits violated the Illinois Public Aid Code (Ill. Rev. Stat. 1979, ch. 23, par. 12—4.11), the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1979, ch. 127, par. 1005) and the equal protection clauses of the Illinois and United States constitutions. They also sought the issuance of preliminary and permanent injunctions restraining defendants from implementation of the proposed reductions. Plaintiffs allege that prior to January 1, 1982, the named plaintiffs received, as benefits, substantially larger sums, and that under the reduction proposed by defendants the benefits which they will receive will be reduced from $162 per month to $139 per month. They allege further that if the formula for computation of benefits which defendants proposed were accurately applied, the monthly benefit which each would receive is $162 per month.

On February 17, 1982, defendants filed with the office of the Secretary of State a notice of emergency rulemaking and Emergency Rule 3.5191. The rule established effective March 1, 1982, a single adult person benefit of $139 per month.

On February 19, 1982, plaintiffs filed a motion for temporary restraining order or a preliminary injunction, and the motion was set for hearing on February 24,

1982. Following the hearing the circuit court found that the reduction from $162 to $139 per month of the adult General Assistance benefit embodied in the notice of emergency rulemaking and Rule 3.5191 would cause plaintiff class members irreparable injury. It found that the plaintiff class members had demonstrated a likelihood of success on the merits and that they possessed rights which merited protection under the law. It found further that the threatened injury to plaintiffs from the proposed reduction of benefits outweighed any harm that the preliminary injunction might inflict on the defendants, that granting a preliminary injunction will serve the public interest, and that plaintiffs had met the prerequisites for class certification set forth in section 57.2 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 57.2). It enjoined defendants from reducing adult General Assistance benefits below $162 per month pursuant to its Rule 3.5191. The defendants filed notice of interlocutory appeal. (73 Ill. 2d R. 307(a).) On March 12, 1982, the appellate court denied defendants' motion for a stay of the circuit court's order.

On May 19, 1982, defendants filed in the circuit court a document styled "Report to the Court" in which they stated that pursuant to the prior order they had maintained single adult General Assistance benefits of $162 per month and that "as a result, all funds in the appropriation for General Assistance benefits were exhausted on or about May 10, 1982"; that the General Assembly on May 14, 1982, adopted House Bill 2211 which authorized the transfer of $19,700,000 to the General Assistance appropriation (apparently from the appropriation for medical assistance—group care); that "The debates on House Bill 2211 clearly reflect the General Assembly's awareness and intent that the amount appropriated would provide benefits at the $144 level rather than at the $162 level." Accompanying the report was a motion

that the court clarify its order of February 24, 1982, so as to provide that single adult General Assistance benefits for May and June be paid at the rate of $144 per month. It stated further that all necessary steps had been taken to dismiss the appeal pending in the appellate court "so that there will be no question concerning the jurisdiction of this court."

The motion described the procedures which must be followed in order to implement the payments at the rate of $144 per month. Some recipients had received only $139, and a supplemental payment would be required in those cases. The motion concluded with the statement that unless otherwise instructed by the court the Department would implement the payments to the recipients at the rate of $144 per month for May and June.

On May 21, 1982, the circuit court entered an order which required payment at the rate of $162 per month for May and $126 per month for June. Defendants appealed, and upon allowance of defendants' motion made pursuant to Rule 302(b), the appeal was taken directly to this court. We stayed the effect of the circuit court order, set an accelerated briefing schedule, and heard oral argument on June 10, 1982.

The record shows that pursuant to section 5.01 of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1979, ch. 127, par. 1005.01) the defendants filed Rule 3.5161 (establishment of assistance standards; income maintenance, G.A.); Rule 3.5171 (amount of assistance standards; income maintenance); Rule 3.5181 (establishment of payment standards; income maintenance); and Rule 3.5191 (payment standards; income maintenance). These were published in the Illinois Register on October 9, 1981, and were filed and became effective on January 14, 1982. Rule 3.5171 established as the amount of assistance standard the sum of $220 per month; Rule 3.5181 provided that the payment standards would be

set on the basis of consolidated flat grant amounts and that the amounts to be paid persons able to engage in employment would be lower than the payments to persons unable to engage in employment. Rule 3.5191 established a payment standard of $141 per month for employable persons and $162 per month for persons unable to engage in employment. Peremptory Rule 3.5191, effective February 11, 1982, stated that in litigation pending in the Federal court the Department had been enjoined from paying employable recipients lower grants than unemployable recipients and that effective February 11, 1982, the payments to all eligible recipients would be $162. Section 5.02 of the Illinois Administrative Procedure Act provides:

"Sec. 5.02. Emergency rulemaking. 'Emergency' means the existence of any situation which any agency finds reasonably constitutes a threat to the public interest, safety or welfare. Where any agency finds that an emergency exists which requires adoption of a rule upon fewer days than is required by Section 5.01, and states in writing its reasons for that finding, the agency may adopt an emergency rule without prior notice or hearing, upon filing a notice of emergency rulemaking with the Secretary of State pursuant to Section 6.01 of this Act. Such notice shall include the text of the emergency rule and shall be published in the Illinois Register. Subject to applicable constitutional or statutory provisions, an emergency rule becomes effective immediately upon filing pursuant to Section 6, or at a stated date less than 10 days thereafter. The agency's finding and a statement of the specific reasons therefor shall be filed with the rule. The agency shall take reasonable and appropriate measures to make emergency rules known to the persons who may be affected by them.

An emergency rule may be effective for a period of not longer than 150 days, but the agency's authority to adopt an identical rule under Section 5.01 of this Act is not precluded. No emergency rule may be adopted more than once in any 24 month period. Two or more emer-

gency rules having substantially the same purpose and effect shall be deemed to be a single rule for purposes of this Section." (Ill. Rev. Stat. 1981, ch. 127, par. 1005.02.)

On February 17, 1982, defendants filed an emergency rule providing that commencing March 1, 1982, and continuing through the balance of the fiscal year ending June 30, 1982, "the amount of the General Assistance grants for a single adult person employable or unemployable is established at $139."

In the posture in which this matter comes before us, the only issue presented is whether the circuit court abused its discretion in its ruling on defendants' motion to clarify the order of February 24, 1982. (*Lonergan v. Crucible Steel Co. of America* (1967), 37 Ill. 2d 599, 612.) Emergency Rule 3.5191 purported to remain in effect only through the balance of the fiscal year ending June 30, 1982. The preliminary injunction and the order entered on May 21, 1982, affected only payments to be made for the months of May and June 1982. The questions whether defendants were possessed of the authority to reduce the payments and whether such reduction was in violation of any constitutional or statutory provision remain for decision.

"This court will not review cases merely to establish a precedent or guide future litigation" (*Madison Park Bank v. Zagel* (1982), 91 Ill. 2d 231, 235), and this case presents no question which justifies our making an exception to the mootness doctrine.

For the reasons stated the appeal is dismissed and the cause is remanded to the circuit court of Cook County for further proceedings.

*Appeal dismissed;*
*cause remanded.*

JUSTICE SIMON, dissenting:

I find the court's distaste for dealing with the merits of this case and the disposition it reaches troublesome. The

ruling extends the mootness doctrine beyond all limits traditionally recognized by courts of review. Because it does nothing to resolve an ongoing controversy, it is a ruling which I predict will thoroughly confuse both the parties involved in this case and the circuit court of Cook County, whose order this court stayed on May 28, 1982.

It is difficult to discern from the majority opinion's brief discussion what rendered this case moot. The majority appears to reason that since the strict subject of controversy was the propriety of an injunction order and because that order was tailored only to May and June of 1982, the passage of time beyond those months rendered the injunction order a nullity, regardless of whatever underlying rights the parties possessed, and extinguished the object of the dispute. It was my understanding from the briefs and the oral arguments that the parties considered their underlying legal rights to be at issue in this litigation. Defendants argued at length that they were not required by statute to continue paying benefits of $162 per month if funds were unavailable for that purpose and that the legislative intent behind the funding measure passed at defendants' behest on May 14, 1982 (House Bill 2211), was to require defendants to pay only $144 per month for May and June. In an actual as well as a practical sense, the subject of the controversy was the monetary amount which the defendants owed the plaintiffs for May and June; the circuit court injunction which was stayed by this court was merely a vehicle for enforcing payment of $162 in May based on the assumption that $162 was the proper monetary amount, rather than requiring the plaintiffs to go without the full payment in that month and sue for the arrearage later. To hold that this cause is mooted by the expiration of the order is tantamount to saying that the amount owing in May ceases to be owing altogether once May ends. This is not realistic.

The case cited by the majority, *Madison Park Bank v.*

*Zagel* (1982), 91 Ill. 2d 231, stands only for the general proposition that this court will not review cases when they are in fact moot, and is of little help here. We declared that case moot when we discovered that the taxpayer had already paid the Department of Revenue everything it claimed without protest, so that no matter how the case was decided no money would change hands. In this case the issues of whether defendants had the authority to reduce monthly aid payments from $162 to $144 and whether the claimed deficiency is owing for May and June remain in dispute: the defendants not only have not paid any of the disputed arrearage but have vigorously advocated their authority not to do so throughout this litigation and have every reason to continue to do so now, as more payments have come due since the end of June to which the same issues appear to apply.

Even if the instant controversy can be viewed as involving nothing broader than a circuit court injunction good only for the months of May and June, the case is moot only because this court made it moot by issuing its stay order in the May 1982 term of court and then postponing resolution until the next term of our court in September 1982. The issue of the propriety of the order was certainly a live one in May when this court stayed its effect and agreed to hear the case instead of allowing it to be executed or go to the appellate court, where it might have been decided sooner on the merits of the issue.

The majority recognizes that "[t]he preliminary injunction and the order entered [by the circuit court] affected only payments to be made for the months of May and June 1982. The questions whether defendants were possessed of the authority to reduce the payments [from $162 to $144] and whether such reduction was in violation of any constitutional or statutory provision *remain for decision.*" (Emphasis added.) (92 Ill. 2d at 515.) Having accepted this case by direct appeal, we should not avoid deciding these ques-

tions by characterizing them as moot or by adopting the view that they were not really the essence of the case. There are two reasons. First, our interference has precluded decisions on these questions which might otherwise have been made by the circuit court or the appellate court before the June payments were completed. Second, as I have mentioned above, the State may be liable for additional payments for May and June as well as for any succeeding months in which less than $162 was paid if it turns out that it reduced the General Assistance payments for May and June without statutory authorization. Far from being moot, the controversy and the underlying issues on which its resolution will turn are very much alive. It is unseemly and a waste of time and judicial resources for us to avoid deciding them after having interfered with their decision by the circuit judge or the appellate court.

The cost to the plaintiffs and to the legal system of the majority's action is underscored by the fact that when the plaintiffs requested the circuit court in July to issue an order declaring that they were entitled to a monthly payment of $162 in that month, the circuit judge refused to act on the request on the ground that an issue involving the proper level of the May and June payments was then pending before the supreme court and that our disposition of that case would affect his ruling. He apparently based his conclusion that his decision as to July would be governed by our decision as to May and June on the language in section 12—4.11 of the Public Aid Code that "[a]id payments shall not be reduced" (Ill. Rev. Stat. 1981, ch. 23, par. 12—4.11). His reasoning seems to have been that if the State was entitled to pay $144 in May or June, it was entitled to continue to do so in July, but not otherwise. The circuit judge, unenlightened by our decision as to what the State was entitled to do in May or June, will now presumably have to decide that himself in order to resolve satisfactorily the issue of what the plaintiffs are entitled to in

July—and once he issues an order pertaining to July, the appellate court and this court will presumably be prevented from reviewing the order by this court's novel view of the mootness doctrine, since the month of July is already over.

The merits of this case should have been addressed and resolved in favor of the plaintiffs. I base this on section 12—4.11 of the Public Aid Code, which provides in relevant part:

"The standards [by which grant amounts and need for public aid are determined] shall provide a livelihood compatible with health and well-being for persons eligible for financial aid under any Article of this Code. They shall include recognition of any special needs occasioned by the handicaps and infirmities of age, blindness, or disability. Standards established to determine the eligibility of medically indigent persons for aid under Articles V or VII shall take into account the requirements of the spouse or other dependent or dependents of the applicant for medical aid.

The quantity and quality of the items included in the standards established for food, clothing, and other basic maintenance needs shall take account of the buying and consumption patterns of self-supporting persons and families of low income, as determined from time to time by the United States Department of Agriculture, the United States Bureau of Labor Statistics, and other nationally recognized research authorities in the fields of nutrition and family living.

The items in the standards shall be priced annually for changes in cost, as provided in Section 12—4.15, and prices of the standards adjusted as indicated by the findings of such surveys. *The Department, with due regard for and subject to budgetary limitations, shall establish grant amounts for each of the programs, by regulation. The grant amounts may be less than the prices of the standards and may vary by program, size of assistance unit and geographic area and may be established in the form of a percentage of the standards for any or all programs.*

Aid payments shall not be reduced except for

changes in (1) cost of items included in the standards, or (2) the expenses of the recipient, or (3) the income or resources available to the recipient, or (4) grants resulting from adoption of a consolidated standard." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 23, par. 12—4.11.

Section 12—4.11 was amended in 1980 to provide for annual rather than periodical pricing for changes in costs and to add the italicized portion of the third paragraph quoted. (1980 Ill. Laws 3982, 3987-88, effective Jan. 1, 1981.) Defendants argue that the italicized provision authorizes them to revise the payment level as needed to prevent expenditures from exceeding the sums appropriated. However, the General Assembly, in amending the section, left intact the provision in the last paragraph quoted concerning changes which would authorize a reduction in aid payments. Had it intended that reductions be effected because of "budgetary limitations" without the occurrence of one of the four changes listed in that paragraph, it would have been a simple matter to so provide. Statutes must be read as a whole, and a court may not read a statute so as to render any sentence meaningless or superfluous. (*People v. Warren* (1977), 69 Ill. 2d 620, 627; *Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 466.) The only construction of the statute which would preserve the meaning of the paragraph concerning changes authorizing reductions in aid payments, which is phrased in exclusive language, is to interpret the provision upon which defendants rely as applying only to the establishment of grant amounts for future years where inflation might otherwise indicate an *increase* in such amounts through the operation of the second paragraph quoted. In other words, the provision on which the defendants rely was designed to control increases in payments, not to authorize reductions. This interpretation seems the more natural, in that the provision in question occurs in the paragraph requiring annual pricing of standards rather than at the beginning or end of the section or in the paragraph dealing with reduc-

tions in aid payments. The provision does not authorize the State to *reduce aid payments* in the absence of one of the four changes enumerated in the paragraph dealing with reduction.

Defendants also point to House Bill 2211, the measure which provided funding for public aid payments over May and June 1982, as embodying the intent of the General Assembly that benefit levels for those months be $144 rather than $162. The State musters support for this claim by referring to statements in the legislative debate of Senator Schaffer and Representatives Wolf, Matijevich, Currie, Bullock, Levin, and Jaffe expressing a belief that the measure mandated monthly payment at the $144 level, and a similar statement made by Governor Thompson on signing the bill. However, this belief as to the purport of the measure was by no means unanimous: other representatives, including Representatives Currie, Matijevich and Levin in the same passages cited by defendants, referred to the 11th-hour nature of the bill and stressed that its only purpose was to provide some funds for General Assistance where otherwise there would be none. The statements by individual legislators concerning their belief as to the effect of the bill, if it is ever an accurate indicator of the intent of the legislature as a whole, is certainly a misleading guide in this case, where so many members of the General Assembly expressed contrary opinions.

More significant is the fact that the bill, as passed, contained no provisions purporting to set the level of payment at $144 per month but simply transferred a sum of money originally appropriated for Group Care to the line appropriation for General Assistance. The same bill amended other budgetary items not related to the needs of the Department of Public Aid. Passage occurred in the 11th month of the 1982 fiscal year, and the legislative debate reveals that it was the result of at least one emergency request for funds.

The evidence indicates to me that the legislature intended the bill as an emergency appropriations measure and did not mean to make any changes in the monthly payment level or the standards of assistance. The bill, once viewed as an appropriation, cannot constitutionally be interpreted as changing the State's substantive duty under section 12—4.11 to maintain the General Assistance payment level at $162. (Ill. Const. 1970, art. IV, sec. 8(d); *Benjamin v. Devon Bank* (1977), 68 Ill. 2d 142.) This rule is designed to prevent minorities in the legislature from taking advantage of the crisis-like atmosphere so typically created by budgetary shortfalls late in the fiscal year to force passage of substantive changes in existing laws where those changes might not otherwise command enough votes to pass.

Finally, I find nothing in the 1980 amendment to section 12—4.11, the appropriations bill of May 1982, or the regulations adopted by the Department of Public Aid for the 1982 fiscal year which could be construed as a "[change] in *** grants resulting from adoption of a consolidated standard" so as to permit reduction of aid payments under the terms of section 12—4.11. (Ill. Rev. Stat. 1981, ch. 23, par. 12—4.11.) While it is true that the notice of adopted rules issued by the Department and published in the Register on October 9, 1981, regarding Rules 3.5161, 3.5171, 3.5818, and 3.5191 expresses an intention to base payment standards on consolidated or flat-grant figures rather than on individual determinations of need, as had been done in the past, there is nothing in the record to indicate that any change in payment levels actually arose "from [the] adoption of [the] consolidated standard."

JUSTICE CLARK joins in this dissent.